BRENNAN, J.[1]
¶1 R.D.J. appeals the order terminating his parental rights to his daughter, T.S.J., born May 22, 2010, and the order denying his postdisposition motion. He raises four arguments on appeal.
¶2 R.D.J.'s first two arguments relate to the testimony of the State's expert, Dr. Michelle Iyamah, regarding the Parenting Capacity Assessment (PCA) report she prepared that concluded that R.D.J.'s prognosis for improving his parenting capacity was poor. He argues that counsel rendered ineffective assistance because he: (1) made no attempt to exclude the report as unscientific under Daubert[2] or rebut it with an expert witness; and (2) because he raised no WIS. STAT . § 904.03 objection that the report's probative value was outweighed by the risk of unfair prejudice. R.D.J.'s third argument is that terminating his parental rights based on a finding of failure to assume parental responsibility violated his substantive due process guarantees because T.S.J.'s removal from the parental home made it impossible for R.D.J. to show that he had a substantial parental relationship, which the statute defines as accepting and exercising "significant responsibility for [her] daily supervision, education, protection and care[.]" He argues that trial counsel's failure to raise an as-applied constitutional challenge on that basis constituted ineffective assistance. R.D.J.'s fourth argument is that a CHIPS order itself "creates a substantial court-supervised parental relationship[,]" and that therefore he cannot be found to have failed to assume his parental responsibilities. Relying on two words from the failure to assume statute, he reasons that a CHIPS order "connects a parent to his or her child by court order and by court supervision," and what it creates is "both substantial and a relationship." Therefore, he argues that the CHIPS order in place at the time of the termination of parental rights (TPR) proceedings created a substantial relationship between him and T.S.J., and accordingly the failure to assume grounds cannot be established.
¶3 For the reasons that follow, we reject R.D.J.'s arguments and affirm the trial court orders terminating his parental rights and denying his postdisposition motion.
BACKGROUND
¶4 This court recently set forth the background facts for this TPR case in the separate appeal by T.S.J.'s other parent:
T.S.J., now a seven-year-old child, was born on May 22, 2010. T.S.J. has chronic mental or emotional issues, diagnosed as an adjustment disorder with a mixed disturbance of emotions and conduct, and receives individual therapy four times a month.
T.S.R. is T.S.J.'s mother and R.D.J. is her father. [The mother] has a schizoaffective disorder with active visual and auditory hallucinations and bipolar features. In May 2011, [the mother] began receiving supportive services from the Bureau of Milwaukee Child Welfare (BMCW)'s Safety Services program, consisting of mental health, budgeting, parenting, and educational services. Those services continued until February 21, 2013, when [the mother] sought emergency room treatment that resulted in a five-day hospitalization in the psychiatric ward. [The mother] brought T.S.J. along when she went to the emergency room.
As a result of [the mother's] hospitalization, BMCW removed T.S.J. from her care and obtained a temporary custody order. T.S.J. was placed with foster parents and that original placement has continued, except for an unsuccessful three-month trial reunification in 2014. On May 1, 2013, T.S.J. was found to be a child in need of protective services and a dispositional order placing her outside the home in a BMCW-approved placement was entered. Between May 2013 and May 2014, [the mother] made progress and transitioned to unsupervised visitation with T.S.J.
On June 14, 2014, an order allowing a ninety-day trial reunification of [the mother] with T.S.J. in her home was issued. The order's implementation was delayed until July 2014 because [the mother] needed to obtain utility service for the home. T.S.J. then began living with [her mother] on a trial basis. However, the family case manager observed erratic behavior by [the mother] and, on August 26, 2014, BMCW removed T.S.J. from [the mother's] home and placed her with the father. The placement with [R.D.J.] was also unsuccessful because, contrary to BMCW's instructions, he moved in with [the mother]. The trial reunification order was revoked on September 22, 2014. Since that date, T.S.J. has not been reunified with either parent.
State v. T.S.R. , No. 2017AP548, unpublished slip op. ¶¶ 5-8 (WI App Mar. 20, 2018) (footnotes omitted).
¶5 The underlying CHIPS order was extended, and on May 27, 2015, a petition to terminate R.D.J.'s parental rights to T.S.J. was filed, alleging a continuing CHIPS ground and a failure to assume parental responsibility ground.
¶6 The grounds phase was tried to a jury, from May 9 through May 12, 2016. At trial, the State presented testimony from Dr. Iyamah about the PCA she had produced in this case.
¶7 The report concluded that there was a "high probability" of abuse or neglect by R.D.J. and that the prognosis for his parenting capacity was "poor." On direct examination, Dr. Iyamah testified that R.D.J. had the ability to make improvements in his parenting. On cross-examination, Dr. Iyamah conceded that the tests on which she based the report do not predict abuse, that R.D.J. had no history of child abuse, that improvements in certain areas would reduce R.D.J.'s risk factors, that she did not have information about any improvements R.D.J. had made, and that such information would change the results of the testing, which had been done more than a year prior to the trial.
¶8 There was testimony that R.D.J. participated in no doctor, dental, or therapy appointments for T.S.J., and R.D.J. testified that it had been years since he had done so. A therapist who worked with R.D.J. and T.S.J. testified that R.D.J. was discharged from therapy for refusing to follow the rules during sessions, failing to do what was asked, and inappropriate interaction with T.S.J. R.D.J. was provided mental health and substance abuse counseling, but ultimately he was discharged from the counseling program because he was aggressive and threatening during sessions, attended only sporadically, and failed urine screens. The jury also heard testimony describing occasions in which R.D.J. verbally abused a therapist and two agency staff members and displayed physically aggressive behavior, to such an extent that it became necessary for the court to suspend his visitation with T.S.J. about two months before the fact-finding hearing.
¶9 The jury found that R.D.J. had failed to assume parental responsibility for T.S.J. and that T.S.J. continued to be a child in need of protective services.
¶10 The trial court held a disposition hearing on July 14, 2016. The trial court concluded that "there is no reasonable prospect [that] [R.D.J.] could safely parent [T.S.J.] on a daily basis-with or without familial or systemic support in the near future." As support, it cited the facts that R.D.J. had moved the child back in to the mother's home while the mother was psychotic and dangerous to the child, specific instances in the presence of the child where R.D.J. had failed to control his anger, R.D.J.'s discharge from therapy, and "other instances of implicit or explicit threats to social service professionals." The trial court further noted in support of its conclusion, R.D.J.'s limited understanding of the child's special needs and the fact that he seriously underestimates or totally discounts her needs and challenges.
¶11 The trial court also found that the foster family was committed to adopting T.S.J. and had consistently demonstrated an ability and commitment to provide her with "the nurturing, supportive, structured and loving environment" that those needs demand, in the face of highly challenging behavior occasioned by T.S.J.'s special needs. It granted the petition to terminate R.D.J.'s parental rights, concluding that the termination of R.D.J.'s parental rights served T.S.J.'s best interests. The trial court entered an order on July 19, 2016, terminating R.D.J.'s parental rights.
¶12 R.D.J. filed a notice of appeal, and a motion to remand for postdispositional relief. In October 2017, the trial court issued an order denying the portion of R.D.J.'s postdisposition motion that pertained to a due process challenge and a jury strike challenge. The trial court subsequently held a hearing on R.D.J.'s claims of ineffective assistance of counsel and issued an order denying his motion for a new trial on those grounds.
DISCUSSION
I. There is not a reasonable probability that the result would be different if trial counsel had objected to the PCA and presented rebuttal by a defense expert witness because trial counsel's effective cross-examination of the witness put into evidence the report's limitations and unrelated evidence supported the jury's special verdict.
¶13 R.D.J. argues that he is entitled to a new trial because trial counsel rendered ineffective assistance when he failed to move to exclude the PCA or in the alternative to present a defense expert witness to rebut it.
¶14 Parents in involuntary TPR cases have a statutory right to counsel as provided in WIS. STAT . § 48.23(2), and included is the right to effective counsel. A.S. v. State , 168 Wis. 2d 995, 1004-5, 485 N.W.2d 52 (1992). To prove ineffective assistance of counsel, a party must show that counsel's actions were deficient performance and that there is a reasonable probability that the deficiency was the cause of the outcome. State v. Love , 2005 WI 116, ¶ 30, 284 Wis. 2d 111, 700 N.W.2d 62. In this case, we presume deficient performance, without deciding, and conduct only the prejudice analysis.[3] Our Wisconsin Supreme Court explained the test for prejudice as:
In other words, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine the confidence in the outcome." Under this test, a defendant "need not show that counsel's deficient conduct more likely than not altered the outcome in the case." However, "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." The defendant's burden is to show that counsel's errors "actually had an adverse effect on the defense."
State v. Franklin , 2001 WI 104, ¶ 14, 245 Wis. 2d 582, 629 N.W.2d 289 (citing to Strickland , 466 U.S. 668, 687, 693-94 ). It is R.D.J.'s burden to show that counsel's error "actually had an adverse effect on the defense" and demonstrate a reasonable probability of a different result. See id.
¶15 The thorough cross-examination of Dr. Iyamah by R.D.J.'s counsel, as explained above, made clear that the testing was a year and a half old, that the expert's opinion was that R.D.J. had potential for improvement, that she did not know whether there had been improvement, and that improvements would affect the assessment of his parenting capacity. It also forced her to concede that there was no history of abuse by R.D.J. and that the tests do not predict that R.D.J. will abuse a child. The cross-examination exposed the report's weaknesses and discredited its conclusions. In contrast, there was consistent and unrebutted evidence of R.D.J.'s pattern of lack of involvement with T.S.J., his repeated discharge from services due to inappropriate conduct, his episodes of explosive anger, and his decision to move the child back in with the mother while she was psychotic and dangerous to the child.
¶16 In light of the effective attack on the report's weaknesses and the strength of other admissible and unrebutted evidence presented, R.D.J. has not shown that there was a reasonable probability that the result would have been different. The test for prejudice is not speculation or hindsight. It is his burden to show that counsel's errors "actually had an adverse effect on the defense." Franklin , 245 Wis. 2d 582, ¶ 14 (citation omitted). He has failed to meet that burden.
II. There is not a reasonable probability of a different result if trial counsel had objected to the admission of the PCA on the grounds that its probative value was outweighed by the danger of unfair prejudice.
¶17 R.D.J. argues in the alternative that trial counsel was ineffective for failing to object to the PCA on the grounds that "its probative value is substantially outweighed by the danger of unfair prejudice[.]" See WIS. STAT . § 904.03. As explained above, the danger of unfair prejudice was mitigated or erased by the expert witness's own concessions on cross-examination, and ample admissible and unrefuted evidence supported the special verdict. Therefore, there was not a reasonable probability of a different result had counsel made a § 904.03 objection.
III. WISCONSIN STAT . § 48.415(6) is not unconstitutional as applied to R.D.J. because the finding of failure to assume parental responsibility was based on facts other than R.D.J.'s inability to parent T.S.J. every day while she was in out-of-home care. Trial counsel's failure to argue that it was does not constitute deficient performance.
¶18 R.D.J. argues that trial counsel rendered ineffective assistance because he failed to challenge a termination that was "fundamentally unfair" because it was based on R.D.J.'s failure to be responsible for the "daily supervision ... and care" of T.S.J. and the State had removed T.S.J., making it impossible for him to do so. He bases this argument on Kenosha County DHS v. Jodie W. , 2006 WI 93, 293 Wis. 2d 530, 716 N.W.2d 845, which held that basing a TPR on incarceration alone violated a parent's constitutional due process right because it was "based on an impossible condition of return." Id. , ¶ 3.
¶19 WISCONSIN STAT . § 48.415(6)(a) provides that one of the grounds on which a TPR can be based is the failure to assume parental responsibility, which the State can establish "by proving that the parent or the person or persons who may be the parent of the child have not had a substantial parental relationship with the child." The statute further defines "substantial parental relationship" as the "acceptance and exercise of significant responsibility for the daily supervision, education, protection and care of the child." The word "daily," on which R.D.J. bases his as-applied due process challenge, is contained within the statutory definition of the term. See sec. 48.415(6)(b).
¶20 We conclude that the application of the failure-to-assume grounds as applied to R.D.J. did not violate his due process rights. First, R.D.J. must show that the statute as applied to him penalized him for failing to do something that the State made impossible by removing T.S.J. from the parental home. In order to make that showing, he must show that the basis for the finding of failure to assume grounds in his case was that he did not provide daily supervision and care. Regardless of the word "daily" in the statute, the record shows that the State made no argument to the jury that it should find the failure to assume ground because R.D.J. did not supervise and care for T.S.J. on a daily basis. Second, well-established Wisconsin law makes clear that the analysis of "daily supervision, education, protection and care of the child" is broader than just one snapshot day. The statute and the instruction require the jury to look at the parent's "acceptance and exercise" of significant responsibility and require that the ultimate determination is the totality of circumstances "throughout the child's entire life." Tammy W-G. v. Jacob T. , 2011 WI 30, ¶¶ 3, 21, 333 Wis. 2d 273, 797 N.W.2d 854. Third, the case on which R.D.J. relies, Jodie W. , is limited to its facts-i.e., incarceration of a parent. No Wisconsin case has applied the holding of Jodie W. under these circumstances, and the law is clear that the jury is to look at all of the reasons that the parent has not accepted and exercised significant responsibility throughout the child's life. See Tammy W-G. , 333 Wis. 2d 273, ¶ 3.
¶21 In R.D.J.'s case, this meant the jury was to consider the evidence of R.D.J.'s opportunities to exercise responsibility for T.S.J. over a period of years and his failure to take advantage of those opportunities. R.D.J. has not shown that his narrow reading of the statute (that it penalizes a parent solely for the failure to show that he has exercised responsibility for the child's daily supervision and care when the State has made that impossible by placing the child in out-of-home care) was actually applied to him as the basis for the failure to assume grounds. Therefore, he has not shown that an as-applied challenge to the statute would have created a reasonable probability of a different result, and therefore his counsel's failure to raise such a challenge did not prejudice him. Because he has not shown that the failure prejudiced him, he is not entitled to a new trial on the grounds of ineffective assistance of counsel.
IV. The existence of a CHIPS order does not create a "substantial parental relationship" between R.D.J. and T.S.J. for purposes of applying WIS. STAT . § 48.415(6) because the statute defines what it means by "substantial parental relationship," and a CHIPS order does not satisfy it.
¶22 To establish the failure to assume parental responsibility as grounds in a TPR action, the State must show that R.D.J. did not have a "substantial parental relationship" with T.S.J. See WIS. STAT . § 48.415(6)(a), (b). R.D.J. argues that for purposes of the failure to assume statute, a CHIPS order that is in place in a TPR case "creates a court-ordered and court-supervised substantial parental relationship." He supports this argument with common dictionary definitions of "substantial" ("of considerable importance") and "relationship" ("the state of being connected"). He argues as follows:
A CHIPS order connects a parent to his or her child by court order and by court supervision, and the relationship is considerable and important. The creation of an order with conditions of return, visitation schedules, and the requirement that the government provide court-ordered services therefore is both substantial and a relationship.
¶23 Determining the meaning of WIS. STAT . § 48.415(6) is a question of statutory interpretation, which we decide de novo . Osborn v. Bd. of Regents of Univ. of Wisconsin Sys. , 2002 WI 83, ¶ 12, 254 Wis. 2d 266, 647 N.W.2d 158. "[S]tatutory interpretation begins with the language of the statute." State ex rel. Kalal v. Circuit Court for Dane Cty. , 2004 WI 58, ¶ 45, 271 Wis. 2d 633, 681 N.W.2d 110 (citation omitted). "If the meaning of the statute is plain, we ordinarily stop the inquiry." Id. (citation omitted). "Statutory language is given its common, ordinary, and accepted meaning, except that technical or specially-defined words or phrases are given their technical or special definitional meaning ." Id. ; see also WIS. STAT . § 990.01(1) (emphasis added).
¶24 R.D.J. seeks to define the phrase "substantial parental relationship" by referencing the common and ordinary meanings for two of the words in the phrase, but he ignores the fact that the legislature already gave the phrase a "special definitional meaning" in the statute as follows:
(b) In this subsection, "substantial parental relationship" means the acceptance and exercise of significant responsibility for the daily supervision, education, protection and care of the child. In evaluating whether the person has had a substantial parental relationship with the child, the court may consider such factors, including, but not limited to, whether the person has expressed concern for or interest in the support, care or well-being of the child, whether the person has neglected or refused to provide care or support for the child and whether, with respect to a person who is or may be the father of the child, the person has expressed concern for or interest in the support, care or well-being of the mother during her pregnancy.
WIS. STAT . § 48.415(6)(b).
¶25 The law of statutory interpretation requires us to give "specially-defined ... phrases ... their ... special definitional meaning." Kalal , 271 Wis. 2d 633, ¶ 45. We are not "at liberty to disregard the plain, clear words of the statute." See id. , ¶ 46 (citation omitted). Under the legislature's definition, a CHIPS order is not even included among the factors a court is to consider when evaluating whether a "substantial parental relationship" exists. And more importantly, WIS. STAT . § 48.415(6)(b) plainly states what the phrase "means" for purposes of this subsection: "the acceptance and exercise of significant responsibility for the daily supervision, education, protection and care of the child"-all of which the trial court found R.D.J. failed to do. Thus it is clear and unambiguous that he failed to have the substantial parental relationship defined in the statute.
¶26 Besides, we are to interpret statutes "reasonably, to avoid absurd or unreasonable results." Kalal , 271 Wis. 2d 633, ¶ 46. R.D.J.'s interpretation of the statute would mean that in every case in which there was an existing CHIPS order, a parent would be deemed to have a substantial parental relationship with their child even if the parent never contacted the child during the pendency of the order. No reasonable reading of the statute's definition of "substantial parental relationship" permits such an interpretation.
¶27 For these reasons, we affirm the TPR order and the denial of the postdisposition order.
By the Court. -Order affirmed.
This opinion will not be published. See WIS. STAT. RULE 809.23(1)(b)4.

This appeal is decided by one judge pursuant to Wis. Stat. § 752.31(2)(e) (2015-16). All references to the Wisconsin Statutes are to the 2015-16 version unless otherwise noted.

Daubert v. Merrell Dow Pharmaceuticals., Inc. , 509 U.S. 579, 589 (1993), interpreted Federal Rule of Evidence 702 to require the trial court to admit only reliable expert evidence, based on "scientific ... knowledge." The so-called Daubert standard has been codified in Wisconsin as Wis. Stat . § 907.02.

As a sanction against the State for violating an imputed duty to preserve the test data on which the disputed expert report was based, the trial court limited the evidence in postconviction proceedings to the question of prejudice. It precluded the State from disputing R.D.J.'s assertion that his trial counsel had performed deficiently in failing to challenge the expert's opinion. Although the State does not concede the imputed duty, it limited its briefing to this court to the prejudice prong in keeping with the trial court's sanction.